## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CYRUS KAR,                                  )
      Detainee, Camp Cropper           )
      Baghdad, Iraq,                   )
      By His Next Friends;             )
                                       )
SHAHRZAD FOLGER, PARVIN                     )
MODARRESS,                                  )
      As Next Friends of Cyrus Kar;    )
      1616 Beverly Blvd.               )
      Los Angeles, CA 90026            )
                                       )
*Petitioners,*                              )
                                       )
      v.                               )
                                       )
GEORGE W. BUSH,                             )
      President of the United States   )
      The White House                  )
      1600 Pennsylvania Ave., N.W.     )
      Washington, D.C. 20500;          )
                                       )
DONALD H. RUMSFELD,                         )
      Secretary, United States         )
      Department of Defense            )
      1000 Defense Pentagon            )
      Washington, D.C. 20301-1000      )
                                       )
FRANCIS J. HARVEY,                          )
      Secretary of the Army            )
      101 Army Pentagon                )
      Room 3E-506                      )
      Washington, D.C. 20310-0101      )
                                       )
                                       )
*Respondents.*                              )


## PETITION FOR WRIT OF <u>HABEAS CORPUS</u>

# I.
## INTRODUCTORY STATEMENT

1. Petitioners Shahrzad Folger ("Folger") and Parvin Modarress ("Modarress") seek a Writ of
   Habeas Corpus on behalf and as next friends of Cyrus Kar ("Cyrus" or "Mr. Kar"). Ms. Folger
   is Kar's first cousin, and Ms. Modarress is his aunt, the sister of his mother. Ms. Folger and Ms.
   Modarress are Kar's closest living relatives in the United States.

2. Cyrus Kar is a United States citizen. See Exhibit 1 (previous U.S. passport).[1] He was born in
   Tehran on March 18, 1961, and first came to the United States when he was approximately three
   years old. He has lived permanently in the United States since age ten or eleven. Mr. Kar served
   in the United States Navy for three years. See Exhibit 2 (military identification card). He resides
   in Los Angeles, California.

3. Mr. Kar is now imprisoned by the United States military in Iraq without the slightest hint of legal
   authority. His arbitrary military detention is unaccompanied by any charge, any warrant, any
   writ, or any process. So far as either the civilian or the military court system is concerned, Mr.
   Kar has simply disappeared into detention without a trace. He arrived in Iraq on May 17, 2005,
   after first receiving permission from American authorities to travel inside the country to
   complete the filming of a documentary about an ancient Persian king. He was arrested almost
   immediately. Fifty days later he remains in American military detention at Camp Cropper, near
   the Baghdad airport, having received no explanation whatsoever for his captivity. He has not
   been charged with any crime, designated as any kind of enemy, nor, worst of all, been given any
   assurance as to when his detention will end. He has not even seen a lawyer, let alone a judge or

---

[1]Petitioners are in possession of Cyrus Kar's previous passport. He took his current
passport with him on his trip.

jury. Apart from three short, closely monitored phone calls to his relatives in Los Angeles, petitioners Folger and Modarress, and a visit from the Red Cross, he has had no contact with the outside world for nearly two months.

4.  After Mr. Kar was detained in Iraq, he expressly authorized the FBI to investigate him, even directing his relatives to turn over the keys to his home in Los Angeles. The FBI conducted a thorough investigation, including the administration of a lie detector test, and thereafter informed Mr. Kar's relatives that it "knew Cyrus better than he knew himself," and that he had been cleared and would be released shortly. Weeks later, Mr. Kar remains in United States military detention, with no explanation or even idea of why or for how long he will remain imprisoned without charge in Iraq.

5.  The most elemental legal principles by which we govern ourselves cannot countenance the lawless detention without justification of a United States citizen by his own government. Our Constitution, consistent with bedrock rules of international law, mandates that our government not arrest its citizens and hold them indefinitely and virtually <u>incommunicado</u> without providing any reason or affording access to counsel or any legal process.

6.  Pursuant to the President's authority as Commander-in-Chief, the duty of the Secretary of Defense to oversee the conduct of the armed forces of our nation, and the duty of the Overseer of Military Detentions in Iraq to oversee the conduct of military detention in Iraq, Respondents George W. Bush, President of the United States, Donald H. Rumsfeld, U.S. Secretary of Defense, and Army Major General William H. Brandenburg, Overseer of Military Detentions in Iraq, are either ultimately responsible for or have been charged with the responsibility of maintaining the custody and control of Cyrus Kar at Camp Cropper. Petitioners now seek the release of Cyrus

2

Kar from detention and a formal explanation as to the circumstances of his arrest and detention.

## II.
## JURISDICTION

7.  Petitioners invoke this Court's jurisdiction and power to grant relief under 28 U.S.C. §§ 2241,

    1331, 1350, 1651, 2201, and 2202, 5 U.S.C. § 702, as well as Article I § 9, cl. 2 (the "Suspension

    Clause"), Article III, the First Amendment, and the Due Process Clause of the Fifth Amendment.

    Petitioners claim Mr. Kar's detention is unlawful under the Fifth and Sixth Amendments to the

    United States Constitution, 18 U.S.C. § 4001(a) ("the Non-Detention Act"), the Geneva

    Conventions, and customary international law. Because they seek declaratory relief, Petitioners

    also rely on Fed. R. Civ. P. 57 and 65.

8.  This Court is empowered to grant this Writ of Habeas Corpus under 28 U.S.C. § 2241, and to

    consider the Petition filed by Shahrzad Folger and Parvin Modarress on behalf and as next

    friends of Cyrus Kar pursuant to 28 U.S.C. § 2242, insofar as Mr. Kar is detained unlawfully by

    the federal government without access to the courts. See, e.g., Rasul v. Bush, 542 U.S. 466, 124

    S.Ct. 2686, 2698 (2004) (holding that federal habeas corpus jurisdiction "requires nothing more"

    than a claim of unlawful detention by the federal government and personal jurisdiction over the

    custodians). In addition, this Court has jurisdiction pursuant to the Suspension Clause, Article

    I § 9, cl. 2 of the United States Constitution, Article III of the United States Constitution, and the

    Due Process Clause of the Fifth Amendment to the United States Constitution, because those

    provisions entitle Petitioners to a judicial forum in which to contest the legal validity of Mr.

    Kar's detention. See, e.g., Hamdi v. Rumsfeld, 542 U.S. 507, 124 S.Ct. 2633, 2650-51 (2004)

    (holding that even enemy combatant captured abroad must be afforded judicial process to contest

the validity of his detention because "it would turn our system of checks and balances on its head to suggest that a citizen could not make his way to court with a challenge to the factual basis for his detention by his government, simply because the Executive opposes making available such a challenge. Absent suspension of the writ by Congress, a citizen detained as an enemy combatant is entitled to this process.").

9.  The fact that Mr. Kar is detained in Iraq does not deprive this Court of subject matter jurisdiction over this petition. The government cannot seriously contend that a United States citizen detained at a United States military base on foreign soil can be denied access to our federal courts and arbitrarily deprived of his liberty. Rasul, 124 S.Ct. at 2696 ("Respondents themselves concede that the habeas statute would create federal-court jurisdiction over the claims of an American citizen held at the base. Tr. of Oral Arg. 27."). In any event, Camp Cropper, where Kar is detained, is as a functional and practical matter within the plenary and exclusive "jurisdiction or dominion exercised in fact" of the United States, such that this Court has jurisdiction over a claim brought by an American citizen detained there. Id. at 2697.

10. Venue is proper in this district because one or more of the Respondents reside within the respective jurisdiction of this Court and are accordingly amenable to service of process in the district.

### III.
### PARTIES

11. Petitioner Parvin Modarress is a United States citizen and aunt of Cyrus Kar. She is the sister of Cyrus's mother. She is a resident of Los Angeles, California. Because Mr. Kar has been denied access to legal counsel and to the courts of the United States, Ms. Modarress acts as his

4

next friend. Ms. Modarress has repeatedly sought to contact her nephew to learn about his status and condition, and otherwise to gain access to him. United States authorities have denied or ignored her attempts. The United States has refused to provide Ms. Modarress the reasons for his continued detention. Her declaration is attached as Exhibit 3.

12. Petitioner Shahrzad Folger is a United States citizen and cousin of Cyrus Kar. Her mother and Cyrus's mother are sisters. She is a resident of Los Angeles, California, and a graduate of the University of Southern California. Because Mr. Kar has been denied access to legal counsel and to the courts of the United States, Ms. Folger acts as his next friend. Ms. Folger has repeatedly sought to contact her cousin to learn about his status and condition, and otherwise to gain access to him. United States authorities have denied or ignored her attempts. The United States has refused to provide Ms. Folger the reasons for his continued detention. Her declaration is attached as Exhibit 4.

13. Respondent George W. Bush ("President Bush") is the President of the United States and Commander-in-Chief of the United States Military. Cyrus Kar is being detained pursuant to President Bush's authority as Commander-in-Chief. Accordingly, President Bush is responsible for Mr. Kar's unlawful detention. He is sued in his official capacity.

14. Respondent Donald Rumsfeld ("Respondent Rumsfeld") is the Secretary of the United States Department of Defense. As a delegate of certain aspects of the President's authority as Commander-in-Chief and under the laws and usages of war, Respondent Rumsfeld has been charged with maintaining the custody and control of Cyrus Kar. He is sued in his official capacity.

15. Respondent Francis J. Harvey, Secretary of the Army, is responsible for the Army's military

5

operations in Iraq and the custodian responsible for Mr. Kar's detention. He is sued in his official capacity.

### IV.
### STATEMENT OF FACTS

#### A. Background

16. Cyrus Kar is a United States citizen. He was born in Tehran, then left Iran as an infant and lived in Germany briefly. He first came to the United States when he was approximately three years old. When he was eight or nine years old, he returned to Iran for a couple of years before returning to the United States, where he has since resided permanently.

17. Cyrus grew up first in the Pacific Northwest, and then in Northern California. After graduation from high school, he worked for a time and then joined the United States Navy. He served in the Navy for three years, eventually attaining the rank of Third Class Petty Officer.

18. Cyrus next attended San Jose State University where he received an undergraduate degree in marketing. He worked in sales in the computer industry for several years during the boom period in Silicon Valley. In the mid-1990's, Cyrus received a degree in Technology Management from Pepperdine University. He occasionally taught business-related courses for an online university.

19. Cyrus supported the Bush Administration's policy on terrorism, and, in particular, the invasion of Iraq. Cyrus frequently stated to his cousin and aunt that converting Iraq to democracy was in the best interests of the Iraqi people and for the Middle East as a whole. He expressed the belief that President Bush was doing a good job in regards to foreign policy.

#### B. Documentary Film Project

20. About three years ago, through his readings in history, Cyrus became interested in the history of

ancient Persia, in particular the story of King Cyrus the Great, the founder of Persia, who declared the first charter of human rights known to humankind. Cyrus' research evolved into the writing of a manuscript, and he determined to make a documentary film about Cyrus the Great. At about the same time, Cyrus began to work part-time as a professor at the University of Phoenix. He undertook extensive research, including multiple interviews with David Stronach, Professor of Near Eastern Archaeology at the University of California, Berkeley, recipient of the Archaeological Institute of America's highest award, the Gold Medal for Distinguished Archaeological Achievement. See Exhibit 5 (Declaration of David Stronach). He also met with a studio head who specialized in documentary production, and Cyrus developed the film together with the executive. See Exhibit 6 (Declaration of Philippe Diaz).

21. Cyrus went to Iran in 2004 to begin filming at historical sites pertinent to the narrative. In Iran, through an organization of independent filmmakers, he found a cameraman, Farshid Faraji. In all, Cyrus traveled to England, Iran, Tajikistan, Turkey, and Afghanistan to continue the filming and to interview scholars. He accumulated dozens of hours of footage, which he brought back to Los Angeles so as to work on editing and production with the studio. Cyrus then determined to go to Iraq to film the ancient city of Babylon in order to complete the project. See Exhibit 7 (Declaration of Mark Moore).

**C. Iraq**

22. Throughout the project, Cyrus had diligently secured permission for filming from all governmental authorities. Cyrus accordingly applied for and received appropriate permits and visas from the United States and Iraqi governments and from Kurdish authorities to film in Iraq. Most likely on May 16 or 17, 2005, Cyrus entered Iraq. His return flight from Tehran to Los

7

Angeles was scheduled for May 23. He did not take this flight.

23. On the morning of May 24, petitioner Modarress spoke by telephone with Cyrus after more than a week without any contact. The call was brief. He said that he was in United States custody and that an FBI agent would soon call her to obtain the key to his home in Los Angeles in order to conduct a full search of the premises. Cyrus asked Modarress to assist the FBI with its investigation. Kar's family had rescheduled Cyrus' flight home for a week or two later, and Ms. Modarress asked him if she should change the reservation. As Cyrus began to answer, she heard a third American voice in the background saying that he should keep the reservation. Cyrus said that what had happened was a misunderstanding, and that it all would be fine.

24. On or about May 24, without seeking a key to Cyrus' residence from petitioner Modarress, the FBI conducted a thorough search of the premises. An FBI agent left his business card on a coffee table along with a receipt for items seized: a computer, bank and credit card statements, and other personal papers. Ms. Modarress thereafter telephoned the agent who stated that the FBI would ask Cyrus a few questions and return all items upon his return to Los Angeles. He explained that the military and the government simply wanted to confirm that they had nothing to fear regarding Cyrus since he was in Iraq during the war. The agent also told the family that it would not be necessary to contact an attorney or others for assistance.

25. On June 6, 2005, the American military permitted Cyrus to place a brief telephone call, lasting no more than ten minutes, to his aunt. Ms. Modarress asked Cyrus what had happened, and when he began to respond, "it's because of our taxi driver," an American voice in the background said, "don't say anything else." Ms. Modarress asked Cyrus if he had been tortured, and he responded "not now, but before." Cyrus stated that he was concerned about the safety and

welfare of his cameraman, Farshid Faraji, who had been left by U.S. military authorities with the Iraqi military. Cyrus asked that a letter be sent to Senator Barbara Boxer, and requested that her office email him. Ms. Modarress sought to continue speaking with Cyrus, but the U.S. authorities limited the call to ten minutes.

26. Petitioners Folger and Modarress thereupon attempted to email Cyrus. These emails were returned as undeliverable.

27. Petitioner Folger then undertook to contact government officials and personnel for assistance. She spoke with Lt. Robert Sanchez of the U.S. Navy, who stated that the Navy could not assist because Cyrus no longer served. Messages were left with State Department personnel, but no calls were returned. A call to the Department of Justice resulted in no assistance. Ms. Folger was given a telephone number with two extensions in the United States by a State Department employee which were presented as a direct link to the United States Embassy in Iraq. Ms. Folger tried these numbers on many occasions over many days. No person or machine ever answered these calls.

28. On or about June 8, petitioners attempted to reach the FBI agent who had searched the apartment and left his business card. He telephoned Ms. Folger on June 9. The agent explained why Cyrus and Farshid had been detained. He stated that they had been passengers in a taxi whose driver was in possession of an item (which the agent later explained was a washing machine timer), which he said could be used for an explosive device. The agent stated that the military "just needs to cross all their t's and dot all their i's." He said that Ms. Folger needed to be patient, and that he believed that Cyrus would probably be home by mid-June. Ms. Folger said that if Cyrus did not contact them or was not released within a few days, the family would consider legal

9

action. The agent responded that Cyrus was safe and would probably be coming home shortly.

29. On or about June 14, the FBI agent also met with Ms. Modarress. The agent stated that the FBI

would be returning Cyrus' possessions from the residence because the agency had completed its

investigation and had no further need for them. He also said Cyrus had passed a lie detector test

and had been "cleared." The agent assured Ms. Modarress that he had investigated Cyrus -- that

he "kn[e]w Cyrus better than he knew himself" -- and that he was certain that Cyrus was who

he said he was. Ms. Modarress asked if she should retain a lawyer. The agent responded that

there was no reason to contact an attorney or anyone else, as there was "nothing to worry about."

He stated that the FBI was "doing [its] best to bring Cyrus home." He added that he would like

to meet Cyrus when he returned. See, e.g., Exhibit 8 (Declaration of John "Jack" Folger).

30. Subsequent and repeated attempts by or on behalf of Ms. Folger and Ms. Modarress to contact

authorities at the State Department, the Defense Department, and the Iraqi Embassy to obtain

information about Cyrus have been rebuffed or ignored.

31. On June 28, 2005, Ms. Modarress received a telephone call from an individual who appeared to

be an American soldier in Iraq. He said that Cyrus would call in a short time, and that he needed

to discuss his bills at home.

32. Cyrus telephoned approximately one hour later. Ms. Modarress and Ms. Folger were both on

the telephone. They asked Cyrus when he was returning, and he responded that he did not know.

Ms. Modarress stated that letters and emails had been sent to him, and he responded that he had

not received any communications. Ms. Modarress stated that the FBI had cleared him, and that

he had passed the lie detector test administered to him. Cyrus responded that he had not been

informed of either fact. Cyrus became very upset and stated that he continued to be very worried

10

about the well-being of his cameraman. He also noted that people were listening in on the call.

33. Cyrus was then told that his time on the telephone was over. Ms. Modarress and Ms. Folger asked when he would call again and he responded that he hoped to call once a month. Ms. Folger asked those individuals monitoring the call to please permit him to call sooner. Cyrus, Ms. Modarress and Ms. Folger each said, "I love you," and then Cyrus hung up.

## V.
## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### Unlawful Detention Under the Due Process Clause of the Fifth Amendment

34. Petitioners reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

35. The government's detention of Mr. Kar constitutes a denial of the most fundamental right guaranteed by the Due Process Clause -- freedom from arbitrary detention. See, e.g., Hamdi v. Rumsfeld, 542 U.S. 507, 124 S.Ct 2633, 2646 (2004) ("[Hamdi's claim] is the most elemental of liberty interests -- the interest in being free from physical detention by one's own government."). The Due Process Clause protects United States citizens detained by the United States government, even if the detention occurs abroad. Reid v. Covert, 354 U.S. 1, 5-6 (1957) (holding that Due Process Clause protects citizens abroad) (plurality opinion).

36. The United States government's detention of Mr. Kar is arbitrary in at least two ways. First, Mr. Kar has not been afforded any procedure with respect to his detention. The Constitution forbids the government from detaining any person without some process and access to a basic system of independent review. See, e.g., Hamdi, 124 S.Ct at 2648 (holding, even for enemy combatant, that "a citizen-detainee seeking to challenge his classification as an enemy combatant must

11

receive notice of the factual basis for his classification, and a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker."). Mr. Kar has received no notice, hearing, or process of any kind. Indeed, apart from three extremely short phone calls to Petitioners and a visit from the Red Cross, he has had no contact with the outside world. This complete absence of any process violates the Due Process Clause. Second, the government has not offered any formal justification for Mr. Kar's detention; he has not been declared to be dangerous to anyone or an enemy of this country or its security in any way. Completely unjustified detention is paradigmatically arbitrary.

## SECOND CLAIM FOR RELIEF
### Denial of Access to Counsel
### under the Fifth and Sixth Amendments and *Habeas Corpus*

37. Petitioners reallege and incorporate by reference each and every allegation in the preceding paragraphs as if set forth fully herein.

38. The conditions of the arrest and detention of Mr. Kar have denied him meaningful access to counsel. See Hamdi, 124 S.Ct. at 2652 (holding that Hamdi "unquestionably has the right to access to counsel in connection with the proceedings" concerning the validity of his detention.).

## THIRD CLAIM FOR RELIEF
### Unlawful Detention under the Non-Detention Act

39. Petitioners reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

40. The Non-Detention Act forbids the detention of United States citizens absent legal authorization from Congress. See 18 U.S.C. 4001(a) ("No citizen shall be imprisoned or otherwise detained

by the United States except pursuant to an Act of Congress.").

41. No Act of Congress authorizes the detention of Mr. Kar, a civilian United States citizen detained for fifty days without any charge or allegation of unlawful conduct, without any order from any court of competent jurisdiction, and without any process. Therefore, his detention violates the Act.

### FOURTH CLAIM FOR RELIEF
#### Prolonged Arbitrary Detention In
#### Violation of Customary International Law

42. Petitioners reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

43. International customary law prohibits prolonged arbitrary detention. Respondents have breached and continue to breach their obligations under customary international law, accepted by and binding on the United States, by seizing and continuing to hold Cyrus Kar, a U.S. citizen, without justification, charge or judicial proceeding; failing and/or refusing to make any determination of his status under applicable treaties; and denying him the opportunity to appear before an independent judicial officer to challenge his continued detention. Respondents have violated, and continue to violate Mr. Kar's right to be free from prolonged arbitrary detention under customary international law.

44. Prolonged arbitrary detention is one of only seven universally condemned wrongs that the Restatement (Third) of Foreign Relations describes as violating customary international law (Rest. 3d Foreign Relations § 702), and is prohibited by, inter alia, Article 9 of the Universal Declaration of Human Rights, Article 9 of the International Covenant on Civil and Political Rights ("ICCPR"). 999 U.N.T.S 171, ratified by the United States on June 8, 1992, and by

13

numerous other international treaties and documents. The United States has repeatedly affirmed its acceptance of this norm of customary international law, including, <u>inter alia</u>, in its submissions to the International Court of Justice during the Iranian hostages case.

45. In addition, the customary international law of armed conflict prohibits the arbitrary deprivation of liberty in both international and non-international armed conflicts. <u>See</u> Jean-Marie Henkaerts & Louise Doswald-Beck, eds., <u>Int'l Committee for the Red Cross, Customary International Humanitarian Law, Volume I: Rules</u>, 344-52 (2005) (stating the rule and collecting citations to U.N. Security Council resolutions, national legislation, national military manuals, and international and national jurisprudence supporting the rule); <u>id</u>. at 347 ("No official contrary practice was found with respect to either international or non-international armed conflicts. Alleged cases of unlawful deprivation of liberty have been condemned."). The United States has officially endorsed this rule—even in "military operations other than war." U.S. Judge Advocate General, Operational Law Handbook 59 (2003) ("<u>No one shall be subject to arbitrary arrest or detention.</u>") (emphasis in original).

### FIFTH CLAIM FOR RELIEF
### Violation of the Geneva Conventions

46. Petitioners reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as it set forth fully herein.

47. Cruel treatment is prohibited by Article 3 common to all four Geneva Conventions. Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field of August 12, 1949, 6 U.S.T. 3114, 75 U.N.T.S. 31; Geneva Convention for the Amelioration of the Condition of the Wounded, Sick and Shipwrecked Members of Armed

14

Forces at Sea, Aug. 12, 1949, 6 U.S.T. 3217, 75 U.N.T.S. 85; Geneva Convention Relative to

the Treatment of Prisoners of War of August 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135; and

Geneva Convention relative to the Protection of Civilian Persons in Time of War of August 12,

1949, 6 U.S.T. 3516, 75 U.N.T.S. 287 ("Common Article 3").  The prohibition on cruel

treatment in Common Article 3 forbids arbitrary deprivation of liberty during armed conflicts.

See Jean-Marie Henkaerts & Louise Doswald-Beck, eds., Int'l Committee for the Red Cross,

Customary International Humanitarian Law, Volume I: Rules, 344 (2005) ("Common Article 3

of the Geneva Conventions. . . require[s] that all civilians and persons hors de combat be treated

humanely. . ., arbitrary deprivation of liberty is not compatible with this requirement."). The

United States ratified the Geneva Conventions on August 2, 1955.  Common Article 3 of the

Geneva Conventions is implemented by Chapter 1-6 of Army Regulation 190-8, Enemy

Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees, effective from

November 1, 1997.

48. By the actions described above, respondents have violated and continue to violate the rights of

Cyrus Kar to be free from arbitrary deprivation of liberty as guaranteed by the prohibition on

cruel treatment under Common Article 3.

## PRAYER FOR RELIEF

WHEREFORE, petitioners respectfully pray for relief as follows:

1. Order Cyrus Kar released from Respondents' unlawful custody;

2. Order Respondents to allow counsel to meet and confer with Cyrus Kar, in private and

unmonitored attorney-client conversations, both by phone and in person;

15

3. Order Respondents to cease all interrogations of Cyrus Kar, direct or indirect, while this litigation is pending;

4. Order and declare that the prolonged, indefinite, and restrictive detention of Cyrus Kar is arbitrary and unlawful, a deprivation of liberty without due process in violation of the Fifth Amendment to the United States Constitution, a deprivation of right to counsel in violation of the Fifth and Sixth Amendments, and in violation of the law of nations and treaties of the United States;

5. Order and declare that Cyrus Kar is being held in violation of customary international law, the Geneva Conventions, and applicable military regulations;

6. To the extent Respondents contest any material factual allegations in this Petition, schedule an evidentiary hearing, at which the parties may adduce proof in support of their allegations, and order that Cyrus Kar be made present for that hearing telephonically or in person;

7. Grant such other relief as the Court may deem necessary and appropriate to protect Petitioners' rights under the United States Constitution, federal statutory and regulatory law, and international law; and

16

8.  Grant Petitioners reasonable attorneys' fees and costs.

Dated:    July 6, 2005

Respectfully submitted,

Counsel for Petitioners:


Mark D. Rosenbaum. *Pro Hac Vice*
Ahilan T. Arulanantham, *Pro Hac Vice*
Ranjana Natarajan, *Pro Hac Vice*
ACLU Foundation of Southern California
1616 Beverly Boulevard
Los Angeles, California  90026
Tel:  (213) 977-9500, x224


Arthur B. Spitzer, Bar No. 235960
American Civil Liberties Union
    of the National Capital Area
1400 20th Street, N.W. #119
Washington, D.C.  20036
Tel: (202) 457-0800

Steven R. Shapiro, *Pro Hac Vice*
Lucas Guttentag, *Pro Hac Vice*
Lee Gelernt, *Pro Hac Vice*
Ben Wizner, *Pro Hac Vice*
American Civil Liberties Union Foundation
125 Broad Street
New York, New York  10004
Tel: (212) 549-2500

Erwin Chemerinsky, *Pro Hac Vice*
Duke University School of Law
Science Drive & Towerview Road
Durham, North Carolina 27708
Tel: (919) 613-7173

17

Paul Hoffman, *Pro Hac Vice*
Schonbrun, DeSimone, Seplow, Harris & Hoffman
723 Ocean Front Walk
Venice, California  90291
Tel: (310) 396-0731

18